IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2009

**STATE OF TENNESSEE v. JOHNNY PETERSON**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-06768     Paula Skahan, Judge**

**No. W2008-01340-CCA-R3-CD  - Filed September 18, 2009**

The defendant, Johnny Peterson, was convicted of first degree murder and attempted first degree murder.  He received a life sentence for his first degree murder conviction and a sentence of twenty-one years for his attempted first degree murder conviction to run concurrently with his life sentence.  On appeal, the defendant argues that the evidence presented at trial was insufficient to sustain his convictions.  Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Thomas T. Woodall and Camille R. McMullen, JJ., joined.

Gregg Carman (on appeal and at trial) and Vicki Carriker (at trial), Memphis, Tennessee for the appellant, Johnny Peterson.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Pritchard and Betsy Carnesale, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Background

On August 10, 2006, the defendant was charged with the first degree murder of Alfred Henderson and the attempted first degree murder of Delaney Haynes.  A trial commenced on March 17, 2008.  On March 20, 2008, the jury returned its verdicts finding the defendant guilty on both charges.  From the trial, we summarize the following testimony.

Delaney Haynes testified that on the morning of March 9, 2006, he was sitting at a bus stop across the street from the In and Out Grocery located on the corner of Pearce and Chelsea Streets.  Mr. Haynes stated that a "gray box Chevy" pulled up to the store and "one dude jumped out and [went] in the store."  Mr. Haynes then saw the defendant get out of the Chevy and walk across the

street toward him.  Mr. Haynes said that the defendant called him "the N word and then he swung," hitting Mr. Haynes in the jaw and the two began to fight.  Mr. Haynes explained that he"was into it" with the defendant's uncle who owed Mr. Haynes twenty dollars.  Neither Mr. Haynes nor the defendant had a weapon, but the defendant told Mr. Haynes that he was going to kill him.  Someone grabbed the defendant from behind and broke up the fight.  The defendant crossed Pearce Street and got into the Chevy.  Mr. Haynes said the driver of the Chevy drove away and stopped on Chelsea where "they were talking to Jimmy [Freeman]" and "[t]hen they pulled off."

Mr. Haynes stated that Alfred Henderson, nicknamed "Scooter," crossed the street and called out to him and asked what was going on.  Mr. Haynes told him that "the dude say he's fixing to come kill me."  Mr. Haynes testified that he was afraid that the defendant was going to come back and kill him because he had threatened him during the fight.  Mr. Henderson told Mr. Haynes that he was going to talk to the defendant and that he did not want trouble in the neighborhood.  Mr. Haynes and Mr. Henderson stood talking in front of Mr. Freeman's house located across the street from the In and Out Grocery.  The driver of the Chevy pulled out of the parking lot, into the street, and stopped in front of where they stood.  Mr. Haynes stated that he looked into the Chevy and saw a gun "just out [of] the window. . . then [he saw] the clip was falling out [of] the gun."  Mr. Haynes saw the defendant's face when he leaned forward to put the clip back in the gun.  The defendant pointed the gun "right at him," and Mr. Haynes yelled "[t]hey got a gun," and ran.  He said that the defendant started shooting and Mr. Henderson was hit.

Mr. Haynes stated that he waited at the crime scene until the police arrived and then rode with them to the police station.  On the way to the police station, he spotted the Chevy in the backyard of a house on Pearce Street and identified it to the police as the vehicle that had been involved in the shooting.  On the following day, Mr. Haynes identified the defendant in a photospread sheet and wrote on the sheet "This [is] the one who pulled the pistol and [shot] at me but hit someone else."

On cross-examination, Mr. Haynes stated that after the fight, Mr. Freeman came out of his house clearly displaying a gun.  Mr. Haynes agreed that when he gave a statement to the police on the day of the shooting, he did not say that the defendant had threatened to kill him or that he saw the defendant push a clip back into the gun.  Mr. Haynes agreed that at the preliminary hearing, he said the defendant was probably shooting at him, and also testified that the defendant "was just shooting, no aim or nothing."  Mr. Haynes explained that at the time of the shooting, there were five or six people standing in the street.  He stated "when I first looked at [the defendant], he was aimed at me.  And when I ran, it was - he was just shooting."  On redirect examination, Mr. Haynes said that at the time of the shooting, only the defendant had a gun.

Frederick Jones testified that he had been convicted of burglary and attempted burglary.  He stated that he was twenty-seven years old and that the defendant was twenty-two or twenty-three years old.  Mr. Jones identified the defendant as his "god-brother."  In March of 2006, Mr. Jones was living with the defendant's family on Pearce Street.  He recalled that March 9th was Sammy

Peterson's birthday. At around eight o'clock in the morning, Mr. Jones, the defendant, Sammy,[1] and one of Sammy's friends rode up to the In and Out Grocery in Sammy's Chevy on their way to "purchase a bag of weed to smoke." When they stopped at the store, no one in the Chevy had a gun. Mr. Jones got out of the Chevy and went into the store to buy some chicken. He came out of the store and the Chevy was gone, but it was soon returned and Sammy pulled the vehicle onto the store parking lot. Mr. Jones got into the backseat and Sammy turned the Chevy around and exited the parking lot going straight across Chelsea to Pearce Street. There were people in the street, but Mr. Jones did not see anyone with a gun and no shots were fired at the Chevy. Mr. Jones said that he began to eat his chicken and suddenly heard gunfire "from the back window on the left side of [his] ear." When he looked up, Mr. Jones saw the defendant shooting a black nine millimeter Beretta gun out of the back left window of the Chevy. Mr. Jones stated that the defendant was aiming the gun at "three guys" standing on the sidewalk beside a vehicle. After four or five shots were fired, Sammy drove the Chevy straight down Pearce Street and turned left onto Dunlap Street. Mr. Jones stated that the defendant got out of the Chevy and said "he was sick of these bitches f***ing with him or something like that" and "[h]e needed some more bullets." Mr. Jones returned to the house on Pearce Street and changed his clothes. The police came to the house, took him to the police station, and questioned him about the shooting. Mr. Jones stated that he initially lied because he was nervous, but he later told the police about the shooting and identified the defendant and Sammy from a photospread sheet. On cross-examination, Mr. Jones stated he never heard the defendant say that he was going to try to kill Mr. Haynes. On redirect examination, Mr. Jones said that the house on Pearce Street was close enough for the others to have returned to get a gun while he was in the store. On recross-examination, he confirmed that when he gave his statement, he did not mention that the defendant said he needed more bullets. However, Mr. Jones stated that he "mentioned it to the investigators when they [came] by [his] house."

Ben Daniels testified that he lived in the area where the shooting occurred. Mr. Henderson, his step-cousin, did not live in the area, but he often came by the neighborhood to visit before going to work. Mr. Daniels said that he did not see the fight between Mr. Haynes and the defendant, but he arrived at the scene just after it had occurred. He saw Mr. Henderson, Mr. Freeman, and Mr. Haynes "sitting at the back of [Mr. Henderson's] car talking about the fight." While Mr. Daniels was standing at a nearby bus stop talking to a friend, he heard four or five shots fired and saw that the shots were fired from a gray and black Chevrolet. Before the shots were fired, the Chevrolet pulled out of the store parking lot and stopped. When the shots were fired, Mr. Freeman fell and Mr. Haynes ran across the street toward the store. Mr. Henderson was hit and ran toward the front of his parked vehicle, then collapsed on the steps of Mr. Freeman's house.

Officer Stacey Hughes with the Memphis Police Department testified that on March 9, 2006, she was patrolling North Memphis in a squad car with a police officer trainee, Shonda Harris. They responded to a call reporting a shooting at Chelsea and Pearce Streets. Officer Hughes and Officer Harris were the first police officers to arrive at the scene. They found the victim of the shooting laying on the sidewalk and unresponsive. The victim was taken to the hospital by the fire

---

[1] The defendant and Sammy Peterson share a surname. Therefore, for clarity, we have chosen to refer to Sammy Peterson by his first name. We mean no disrespect to Sammy Peterson.

department. The crime scene was "very chaotic" with people everywhere "fighting amongst themselves all around." Officer Hughes stated that she began to secure the crime scene and called for more police cars.

Officer Roger Wheeler with the Memphis Police Department crime scene unit testified that on March 9, 2006, he responded to a homicide call on Chelsea. When he arrived at the scene, a heavy rain had started. Officer Wheeler and his partner immediately photographed the blood on the sidewalk before it was washed away. He identified a nine millimeter Luger Winchester casing found on the sidewalk in front of a house on Chelsea, a photograph of a bullet hole found in a vehicle parked at the scene, and the victim's broken eyeglasses found in the street.

Officer Anthony Mullins with the homicide unit of the Memphis Police Department testified he investigated the crime scene on the day of the shooting. A heavy rain started to fall before he was able to conclude his investigation of the scene. Officer Mullins confirmed blood was washed away by the rain and a shell casing had to be covered because "it was blowing along the street." Some witnesses were brought into the homicide office for questioning including Mr. Haynes. While Mr. Haynes was being transported to the police station, he spotted a vehicle parked in the backyard of a house on Pearce Street and identified it as the vehicle involved in the shooting. During the investigation, the defendant was identified as a suspect. The homicide unit created a photospread sheet to determine if witnesses could identify the shooter. Two witnesses identified the defendant as the shooter and Sammy was identified as the driver of the vehicle. The police attempted to locate Sammy and the defendant by checking addresses and following up with family members. On March 17th or 18th, arrest warrants were issued. A few weeks later, the defendant was arrested.

Officer Mullins stated he was familiar with the area where the shooting occurred and estimated that the distance between the defendant's house on Pearce Street and the crime scene was "a couple of long blocks[.]" He stated that it would take less than a minute to drive between the two points.

Sergeant Caroline Mason with the Memphis Police Department testified that she interviewed the defendant on April 2, 2006. When she entered the interviewing room, the defendant appeared to be upset and was crying. He announced that he did not shoot anyone and claimed he was "afraid of guns and firecrackers." The defendant stated that he knew the police were looking for him, but said that he did not know why.

The defendant told Sergeant Mason that on March 9th, he walked down the street and got an estimate from a mechanic for the cost to repair a fuel pump and then returned home to work on his vehicle. He stated that he walked back to the repair shop to see about getting his vehicle towed, but the cost for towing the vehicle was too much. The defendant called his cousin and they spent the rest of the day "just smoking weed and chilling." The defendant told Sergeant Mason that he did not return home because he was told that there had been a shooting at the In and Out Grocery and the police were looking for him.

Dr. Lisa Funte testified that she worked as a medical examiner with the Shelby County Regional Forensic Center and that she performed an autopsy on the victim's body. Dr. Funte stated that her report reflected that the victim was a twenty-seven year old African American male and that she determined through her examination that the victim's cause of death was a gunshot wound.

The defendant testified that he knew Mr. Haynes from around the neighborhood because Mr. Haynes and the defendant's uncle had become involved in a conflict. The defendant believed that his uncle was vulnerable to other people due to his drug use and mental problems. According to the defendant, prior to March 9th, he went to the In and Out Grocery in response to a telephone call. When he arrived at the store, he saw Mr. Haynes leaving the area, but did not speak to him. The defendant found his uncle nearby with a "little scar over his eye and . . . blood out of his mouth."

The defendant said that on the morning of March 9th, he "grabbed [his] gun and [he] went outside to work on [his] car." The defendant stated that he always had his gun with him "due to the problems . . . in the neighborhood." While he was working on his car, the defendant's brother, Sammy, drove up in his gray Chevy with Mr. Jones and someone else named Kevin. Sammy gave the defendant a ride to the mechanic's shop. On the way home, they stopped at a gas station and the In and Out Grocery. Mr. Jones went into the store to buy cigars. The defendant spotted Mr. Haynes at a bus stop across the street. He left his gun on the back seat of the Chevy and walked over to ask Mr. Haynes why he was "jumping on" his uncle. As the defendant approached, Mr. Haynes jumped up and the defendant hit him. A fight ensued between the defendant and Mr. Haynes. The defendant denied that he told Mr. Haynes that he was going to kill him. During the fight, the defendant heard "this dude saying 'Hell no. Hell no[,]'" and saw Mr. Freeman crossing the street with a gun. The defendant stated that he was afraid that Mr. Freeman was going to shoot him and he broke away from the fight and ran to the Chevy. Mr. Jones was coming out of the store and he also got into the Chevy. As Sammy pulled the Chevy out of the parking lot, Mr. Freeman stood behind a pole "on the side of the car. . . .like he was fixing to shoot[.]" The defendant stated that he did not look out of the window, but ducked down and "just fired a shot." According to the defendant, he was not trying to kill anyone and explained that "[i]t was [an] honest mistake." After the shooting, the defendant told Sammy to drop him off on Dunlap Street. On cross-examination, the defendant said that he took a gun with him everywhere he went. He confirmed that he ducked down and shot out of the window without aiming the gun in order to scare Mr. Freeman. He agreed that he fired in the same direction that Mr. Haynes was standing. The defendant said that at the time of the shooting, the clip on the gun held ten bullets and was full.

Analysis

Sufficiency of the Evidence

On appeal, the defendant challenges the sufficiency of the evidence, arguing that there was insufficient proof presented at trial to support his convictions of first degree murder and attempted first degree murder. The defendant admits that he "cannot argue . . . that absolutely no evidence exists to support his convictions in light of the testimony[.]" However, he asserts that "his actions were those of a reasonable person in a state of passion created by sufficient provocation to lead to ultimately irrational acts."

We begin our review by setting forth the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2006). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation is explained as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*. An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id.* § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. *Bland*, 958 S.W.2d at 660; *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense[]" and acted "with intent to cause a result that is an element of the offense, and believes

the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a) and (a)(2). Criminal attempt also occurs when the defendant "acts "with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* at § 39-12-101(a)(3).

When viewed in the light most favorable to the state, the evidence presented at the trial established that on the day of the shooting, the defendant approached Mr. Haynes and a fight ensued. Mr. Haynes testified that during the fight, the defendant stated, "I am going to kill you." Mr. Haynes further testified that the defendant got into the Chevy and the driver of the vehicle pulled away. The driver stopped the Chevy on Chelsea Street and the passengers of the Chevy spoke to Mr. Freeman. According to Mr. Haynes, after the fight, Mr. Freeman came from his house and was carrying a gun. Mr. Jones testified that when he came out of the In and Out Grocery, the defendant and the others had left in the Chevy; however they soon returned and the defendant had a gun. Mr. Jones said that the defendant had not been armed when they left the house that morning. The defendant aimed the gun at a group of men on the street and shot out of the back window of the Chevy. Mr. Haynes testified that he saw the defendant's face when he leaned forward to put the clip back in the gun. Mr. Haynes also stated that the defendant was pointing the gun at him. After the shooting, instead of returning to the house on Pearce Street with the other passengers and Sammy, the defendant got out of the Chevy on Dunlap Street. According to Mr. Jones, the defendant said something about being sick of things and that he was going to get some more bullets. Although the defendant stated that when he shot, he was only trying to scare Mr. Freeman who had a gun, he also agreed that he shot in the direction of Mr. Haynes. The evidence showed that during his fight with Mr. Haynes, the defendant stated his intention to kill him. After threatening to kill Mr. Haynes, the defendant retrieved a gun and returned to where Mr. Haynes stood on the sidewalk talking with several others. The defendant aimed the gun in Mr. Haynes' direction and fired several shots. The evidence revealed that in an attempt to kill Mr. Haynes, the defendant shot and killed Mr. Henderson. According to Mr. Jones and Mr. Haynes, only the defendant had a gun at the time of the shooting. Although the defendant testified that he had the gun when he left the house that morning and that he was not aiming the gun at anyone when he shot, the jury found more credible the testimony that the defendant threatened to kill Mr. Haynes and that he returned to the scene with a gun which he aimed at Mr. Haynes and fired. All questions concerning the credibility of the witnesses and conflicts in trial testimony were decided by the jury and we will not revisit the issue of credibility on appeal. *See State v. Bland*, 958 S.W.2d at 659. Moreover, the evidence does not preponderate against the jury's verdicts. Accordingly, we conclude that the evidence was sufficient to sustain the defendant's convictions for first degree murder and attempted first degree murder. The defendant is without relief on this issue.

Conclusion

Based on the foregoing, the judgments of the trial court are affirmed.

-7-

_____
J.C. McLIN, JUDGE